## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ABN AMRO Capital USA LLC; Société Générale; BNP Paribas; Natixis, New York Branch; Macquarie Bank Limited; Bank Hapoalim BM; The Bank of Tokyo-Mitsubishi UFJ Ltd., New York Branch; and Israel Discount Bank of New York : : : : : : : : : | Civil Action No. _____ |
| : | **Complaint** |
| Plaintiffs, : : | |
| v. : : | |
| Peter G. Johnson, Peter B. Johnson, Mary Johnson, Timothy Johnson, Thomas Reich, Richard Gary O'Connor, Nancy Pizzi, and William Yu : : : : : : | |
| Defendants. | |

ABN AMRO Capital USA LLC; Société Générale; BNP Paribas; Natixis, New York Branch; Macquarie Bank Limited; Bank Hapoalim BM; The Bank of Tokyo-Mitsubishi UFJ Ltd., New York Branch; and Israel Discount Bank of New York (collectively, the "**Lenders**" or "**Plaintiffs**") allege as follows:

### SUMMARY OF THE ACTION

1.      Transmar Commodity Group Ltd. ("**Transmar**") was a cocoa supplier and trading company founded and operated by the Johnson family. Transmar had international affiliates engaged in all aspects of the cocoa trade.

2.      Defendants are members of the controlling Johnson family, some of whom were senior executives and directors at Transmar, and Transmar employees who were directly involved in the long-running fraudulent scheme described herein:

a. Peter G. Johnson ("**Johnson Sr**."), Transmar's founder, Chief Executive Officer, and Chairman of the Board of Directors.

b. Peter B. Johnson ("**Johnson Jr**."), who functioned as a de facto Transmar officer and oversaw Transmar's European affiliate, Euromar Commodities GmbH ("**Euromar**").

c. Mary Johnson ("**Mary Johnson**"), a Transmar director and Senior Vice President. She is Johnson Sr.'s wife and mother of Johnson Jr. and Timothy Johnson.

d. Timothy Johnson ("**Timothy Johnson**"), Transmar's Chief Operating Officer and a Transmar director, son of Johnson Sr. and Mary Johnson, and brother of Johnson Jr.

e. Thomas Reich ("**Reich**"), Transmar's Finance Vice President, who signed each of the false Certifications and supervised the Transmar employee who prepared the Borrowing Base Reports.

f. Richard Gary O'Connor ("**O'Connor**"), the Senior Staff Accountant who prepared the Borrowing Base Reports.

g. Nancy Pizzi ("**Pizzi**"), a Senior Staff Accountant and CPA, who kept track of the company's two sets of books: one for the Lenders and one for internal use.

h. William Yu ("**Yu**"), who had an official title of Director of Mergers and Acquisitions, but during the relevant time period was responsible for

financial and/or accounting matters for Transmar, effectively functioning as a Chief Financial Officer.

3.    The Plaintiffs are a group of banks that extended more than $360 million in loans to Transmar pursuant to a senior secured credit facility (the **"Credit Agreement"**), dated February 26, 2016. The Credit Agreement was secured by, *inter alia*, Transmar's inventory, accounts receivable, and forward contracts.

4.    As an inducement to enter into the Credit Agreement, Transmar provided the Lenders with information about Transmar's financial condition, which Transmar promised was complete and accurate. Transmar provided the Lenders with, and certified the accuracy of, Transmar's audited financial statements as of year-end 2014, and unaudited financial statements as of September 30, 2015.

5.    In addition, as a condition precedent for the Lenders' obligation to make the initial advance of funds to Transmar under the Credit Agreement, Transmar provided a certified spreadsheet that described and totaled the amount and type of Lenders' loan collateral (a "**Borrowing Base Report**"). The Borrowing Base Report contained a certification of "Responsible Officer," attesting to the report's completeness and accuracy (a "**Certification**"). As required by the Credit Agreement, Transmar provided additional Borrowing Base Reports on a weekly basis.

6.    At all times, the Lenders reasonably relied upon the financial information provided about Transmar's financial condition and the Borrowing Base

Reports before disbursing funds, and in electing not to accelerate outstanding loans, under the Credit Agreement.

7.     The Lenders did not know, and in the exercise of due diligence could not have discovered, that each of the Defendants participated in a long-running fraudulent scheme to knowingly and intentionally misrepresent Transmar's financial condition and inflate the value of the collateral. Defendants also hid the fact that they moved inventory and receivables back and forth with affiliated companies and falsified the balance owed between Transmar and its affiliates.

8.     In fact, though, as each Defendant knew, Transmar had not generated a positive operating cash flow since 2012.

9.     Defendants went to extraordinary lengths to conceal their fraud—including maintaining two sets of books and records. Thus, Plaintiffs were unable to discover Defendants' fraudulent scheme through the course of their reasonable diligence.

10.     Defendants' internal emails establish their liability beyond any question or doubt. As described below, each Defendant communicated openly about the fraud, including discussing the mechanics of inflating collateral value, the necessity of maintaining two sets of books, and even the "existential threat" posed to the company by their conduct. Defendants sought to protect themselves against discovery of their blatant fraud by the dubious technique of putting subject matter lines on their emails such as, "DO NOT FORWARD –DELETE" and "VERY CAREFUL – DO NOT FAT FINGER FORWARD."

11.     Stunningly, Defendants even complained among themselves via email about the burden of having to create enough false paperwork to keep their fraudulent scheme afloat, as well as the difficulty of tracking the size of the "discrepancy," *i.e.*, the amount of phony collateral value Defendants had reported to the Lenders, between the two sets of books.

12.     If any Defendant had disclosed the true state of Transmar's financial condition and the true extent of Transmar's borrowing base, the Lenders would not have entered into the Credit Agreement or disbursed funds in the aggregate total amount of $360 million, or would have elected to accelerate the loans.

13.     The scheme finally began to unravel in late 2016. By then, the "discrepancy" had grown so large that, apparently, the Defendants could no longer devise sufficient stratagems to paper over their inflated numbers. Defendants disagreed what to do next—Johnson Jr. wanted to disclose nothing to the banks and use additional ruses to further obfuscate the company's financial condition. But Johnson Jr. complained to his father that Pizzi and Reich did not implement his plan.

14.     On November 23, 2016, Transmar made a partial disclosure to the Lenders, telling them that the true value of the eligible collateral was $100 million less than the amount the Lenders had funded. However, Defendants failed to disclose that the reason for the discrepancy was their long-running fraudulent scheme. Nor did Defendants disclose the true extent of discrepancy. Even so, when

Johnson Jr. found out that Transmar had exposed the tip of the iceberg about the effects of the fraud, he was furious.

15.     On December 31, 2016, Transmar filed for bankruptcy protection under Chapter 11. During the bankruptcy proceedings, the Lenders obtained Defendants' internal emails, which revealed for the first time the existence and extent of Defendants' fraudulent conspiracy.

16.     Defendants' internal emails were so profoundly incriminatory that, upon motion of the Lenders, the bankruptcy case was converted to a liquidation under Chapter 7, and a trustee was appointed.

17.     Not long after, the Department of Justice indicted Johnson Sr., Johnson Jr., and Reich, alleging a criminal conspiracy to commit bank fraud and wire fraud. The criminal case is pending in the Southern District of New York, with case number 17-cr-00482-JSR.

18.     The Lenders seek to recover the damages caused by Defendants' knowingly false statements to the Lenders concerning Transmar's overall financial condition and its borrowing base. The Lenders assert claims for fraudulent misrepresentations, fraudulent omissions, negligent misrepresentations, conspiracy to commit fraudulent inducement, conspiracy to commit fraud, and aiding and abetting fraud.

## The Parties

19.     Plaintiff ABN AMRO Capital USA LLC ("**ABN**") is a Delaware limited liability company with its principal place of business in New York. No member of

6

ABN is a citizen of New Jersey. ABN is a Lender under the Credit Agreement, as well as a syndication agent, administrative agent, and collateral agent. ABN brings this action in its individual capacity and as agent for itself and the other Lenders.

20.     Plaintiff BNP Paribas ("**BNPP**") is a corporation organized under the law of France, which has its principal place of business in France. BNPP is a Lender and a co-documentation agent under the Credit Agreement.

21.     Natixis, New York Branch ("**Natixis**") is the New York branch of a corporation organized under the laws of France, which has its principal place of business in France. Natixis is a Lender and a co-documentation agent under the Credit Agreement.

22.     Société Générale ("**Soc Gen**") is a corporation organized under the laws of France with its principal place of business in France. Soc Gen is a Lender and syndication agent under the Credit Agreement.

23.     Macquarie Bank Limited ("**Macquarie**") is a corporation organized under the laws of Australia with its principal place of business in Australia. Macquarie is a Lender under the Credit Agreement.

24.     Bank Hapoalim BM ("**Hapoalim**") is a corporation organized under the laws of Israel, with its principal place of business in Israel. Hapoalim is a Lender under the Credit Agreement.

25.     The Bank of Tokyo-Mitsubishi UFJ, Ltd., New York Branch ("**MUFG"**) is the New York branch of a banking corporation organized under the

laws of Japan, with its principal place of business in Japan. MUFG is a Lender under the Credit Agreement.

26.     Israel Discount Bank ("**IDB**") is a corporation organized under the laws of the State of New York, with its principal place of business in New York. IDB is a Lender under the Credit Agreement.

27.     Defendant Peter G. Johnson is domiciled in the State of New Jersey. At all times relevant to the Complaint, he maintained a business address at Transmar's offices in Morristown, New Jersey.

28.     Defendant Peter B. Johnson is domiciled in the State of New Jersey. At all times relevant to the Complaint, he maintained a business address at Transmar's offices in Morristown, New Jersey.

29.     Defendant Mary H. Johnson is domiciled in the State of New Jersey. At all times relevant to the Complaint, she maintained a business address at Transmar's offices in Morristown, New Jersey.

30.     Defendant Timothy Johnson is domiciled in the State of New Jersey. At all times relevant to the Complaint, he maintained a business address at Transmar's offices in Morristown, New Jersey.

31.     Defendant Thomas Reich is domiciled in the State of New Jersey. At all times relevant to the Complaint, he maintained a business address at Transmar's offices in Morristown, New Jersey.

32.     Defendant Richard Gary O'Connor is domiciled in the State of New Jersey. At all times relevant to the Complaint, he maintained a business address at Transmar's offices in Morristown, New Jersey.

33.     Defendant Nancy Pizzi is domiciled in the State of New Jersey. At all times relevant to the Complaint, she maintained a business address at Transmar's offices in Morristown, New Jersey.

34.     Defendant William Yu is domiciled in the State of New Jersey. At all times relevant to the Complaint, he maintained a business address at Transmar's offices in Morristown, New Jersey.

<u>**JURISDICTION AND VENUE**</u>

35.     This Court has subject matter jurisdiction over Defendants pursuant to 28 U.S.C. §1332(a) because Defendants are citizens of New Jersey and Plaintiffs are citizens of states other than New Jersey or foreign countries. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

36.     Venue lies in this Court pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events and omissions giving rise to this claim occurred within this judicial district.

<u>**ALLEGATIONS OF FACT**</u>

**A. Transmar's history and structure**

37.     Johnson Sr. founded Transmar in 1980. With his family, Johnson Sr. grew Transmar into a global business. However, the capital-intensive growth left the business cash-strapped.

38.     Transmar is a wholly owned subsidiary of Transmar Group Ltd., which is a joint venture controlled by the Johnson family. Transmar Holdings LLC owns 85.135% of Transmar Group Ltd. Transmar Holdings LLC is a wholly owned subsidiary of Morristown Group LLC, which in turn is owned by Johnson Sr., Johnson Jr., Mary Johnson, Timothy Johnson, and Patricia Johnson Gasek.

39.     An organizational chart illustrating the relationship between Transmar and its affiliated entities is attached hereto as Exhibit A. Transmar's affiliated companies owned, operated, or had relationships with cocoa butter and liquor melting facilities in South America and Africa. Transmar entered into many trading and repurchase contracts with its German affiliate, Euromar.

40.     Johnson Sr. and Johnson Jr. were the most senior decision-makers at Transmar during the relevant time period. As demonstrated in internal emails, Transmar's internal accounting and finance personnel, such as Pizzi, Yu, O'Connor, and Reich, sought guidance and approval from Johnson Sr. and Johnson Jr. concerning the mechanics of how to structure and account for the bogus transactions that misrepresented and concealed Transmar's true financial condition. Timothy Johnson and Mary Johnson also directly participated in email communications concerning important decisions about Transmar's finances.

**B. Defendants operated their fraudulent scheme for *years*.**

41.     In September 2011, Transmar entered into a credit facility for which BNPP was the administrative agent for the lenders party thereto (the "**BNPP Credit Facility**"). The lenders to the BNPP Credit Facility loaned money against

Transmar's "borrowing base," a contractual formula that assigned percentage weights to particular classes of collateral. The BNPP Credit Facility required Transmar to send a weekly report that calculated the borrowing base and certified the accuracy of the report (the "**BNPP Borrowing Base Reports**").

42.     The BNPP Borrowing Base Reports were materially significant documents because they determined the amount of money the lenders were obligated to advance or keep outstanding under the BNPP Credit Facility. How much Transmar could borrow at any point in time was principally a function of the value of three main types of assets—accounts receivable, inventory, and net unrealized forward gains—which secured the extension of credit by the banks. The BNPP Borrowing Base Reports set forth this information.

43.     In addition to the BNPP Borrowing Base Reports, Transmar was also required to provide the lenders with audited annual financial statements and monthly unaudited financial statements.

44.     Transmar gave the lenders under the BNPP Credit Facility overstated BNPP Borrowing Base Reports and other false financial information dating back at least to the early years of that September 2011 agreement. As Johnson Jr. admitted in a July 2, 2016 email to Johnson Sr. and Timothy Johnson, "we are about *6-7 years* into the usage of various tactics of drawing against the Borrowing Base to fill collateral gap." Johnson Jr.'s statement about 6-7 years of fraudulent tactics establishes that the scheme to misrepresent and conceal

Transmar's true financial condition and overstate the value of its collateral dates back at least to the earliest days of the BNPP Credit Facility, if not earlier.

45.    Johnson Sr. and Johnson Jr. exchanged other emails in which they discussed the history of their scheme, which included the tactic of recording fake contracts in the version of Transmar's books that was shown to the lenders. In an email dated August 1, 2015, Johnson Jr. explained to his father that a group of contracts had been put on the books "to compensate for the major original Tmar loss booked in 2012/3 on the infamous Dick Krysty [former Transmar CFO] non-existent butter position." Thus, it appears that an actual financial loss on a large trading position may have been the starting point for the fraud.

46.    In that same August 1, 2015 email, Johnson Jr. also admitted that Transmar had entered into improper year-end 2014 transactions for the dual purposes of manipulating the financial results—"we wanted to book as many profits as possible in 2014 for obvious reasons"—and manipulating the borrowing base—"we needed to create ~60M of valid collateral to get the BB [borrowing base] back in compliance." Johnson Jr.'s admissions establish that Defendants' fraud extended far beyond falsifying and inflating the borrowing base reports, and included creating false annual and periodic financial results. In addition, Johnson Jr.'s August 1, 2015 email shows that Defendants used phony transactions involving Euromar to perpetrate their fraud.

47.    On August 3, 2015, Johnson Sr. responded to Johnson Jr.'s email and interspersed comments and questions into Johnson Jr.'s email. Johnson Sr. also

made incontestable admissions about the fraudulent Euromar transactions and the

Defendants' dual purposes for manipulating financial results and the borrowing

base:

> NOT SURE HOW TO UNWIND ALL THIS SHIT------BUT NOT
> SURE THESE CONTRACTS CAN BE TREATED AS
> FUNCTIONALLY "REAL" ---WE PUT THEM IN TO ARTIFICIALLY
> PUMP PROFITS/EXPAND VALUATION FOR IT/OFFSET
> INTERCOMPANY [BALANCE] BB HOLES ETC. HOW WE SPREAD
> THESE/ELIMINATE THESE IS THE TRICK---

Johnson Sr.'s response shows the agreement and coordination between Johnson Sr.

and Johnson Jr. about falsifying Transmar's financials, using Euromar as an

instrumentality for the fraud, and creating a false and misleading paper trail to

conceal the fraud.

48.     In his August 3, 2015 email, Johnson Sr. also responded to a question

Johnson Jr.'s has posed about whether "circles" —*i.e.*, circular transactions—should

be fulfilled. Johnson Sr. replied that he had: "ASKED TOM [Reich] TO

ELIMINATE CLOSED CIRCLES THAT HAD NO P/L IMPACTS AND/OR OTHER

MOTIVES---HE SEEMS RELUCTANT." Johnson Sr.'s response demonstrates that

he and his son gave instructions to Reich and others about how to implement bogus

transactions that were solely—and obviously—created as part of the ongoing

fraudulent scheme.

49.     Still other emails exchanged between Johnson Sr. and Johnson Jr. in

2015 refer to their practice of reverse engineering the company's books: the two

men would decide what results they wanted to report, and then manufacture

transactions that would create those results on paper. On February 15, 2015,

Johnson Sr. emailed Johnson Jr. to figure out what financial results they wanted to show for particular transactions. Once again, Johnson Sr. was utterly clear that, as far as he was concerned, Transmar's books and records could be manipulated by Defendants at will. Johnson Sr. acknowledged that many items could be,

"*FACTORED IN OR OUT and to what extent is somewhat discretionary by us*." (Emphasis added; all caps in original.)

50.     In his February 15, 2015 email, Johnson Sr. used transparent euphemisms to describe various fraudulent "discretionary" adjustments, such as "intercompany dupes and mistakes" and "/book dupes/mistakes/or potential cancellations." He basically summed up the vast scope of the Defendants' fraudulent scheme, saying "depending on our discretionary applications--- we could be long or short." Johnson Jr. responded to the email on February 16, 2015, suggesting that the two of them talk later that day to reach a decision about the mechanics of how to proceed. Johnson Jr.'s mundane reaction to the shocking admissions in his father's email is further proof of Johnson Jr. knowledge, approval, and participation in the ongoing fraudulent scheme.

51.     Mary Johnson and Timothy Johnson participated in emails communications concerning critical aspects of the fraudulent scheme. For example, on August 15, 2015, Johnson Sr. sent an email to Johnson Jr., Timothy Johnson, and Mary Johnson to discuss Transmar's financing needs, which had reached a critical state. On August 16, 2016, Johnson Jr. commented on his father's email in

his reply to all recipients. In his response, Johnson Jr. discussed the existence and scope of the fraud openly, in simple terms:

> "The year-end stuff was put in place to obscure three facts which still exist today. ***1) Transmar consistently submits inaccurate borrowing base reports to the banks, the discovery of which is an existential threat to our company...***" (emphasis added)

No one disputed Johnson Jr.'s description of the fraud on the banks. No one objected or took any action in response to halt the fraud.

52.     As officers and directors of Transmar, Timothy Johnson and Mary Johnson had a duty to speak out and stop the fraudulent scheme, including the fraud on the company's lenders.

53.     Johnson Jr.'s August 16, 2015 email also demonstrates how desperate Defendants were to conceal their fraud. He wrote—prophetically—that "[e]ventually, the whole circus tent is gonna fall in on us. The banks seem to be circling us in ever closer circumference as well."

54.     Johnson Jr.'s August 16, 2015 email also establishes that Defendants affirmatively concealed their fraud from the banks by falsifying Transmar's books and records. As Johnson Jr. admitted: "We can clean up the books to the point that Claire [the banks' collateral auditor] has nothing with which to pin us to the wall."

55.     When Johnson Jr. made these admissions about concealing the fraud from the banks in his August 16, 2015 email, he added his own advice to all recipients for concealing the fraud from detection by changing the subject line for the email chain to: "VERY CAREFUL – DO NOT FAT FINGER FORWARD."

56.     In other emails sent during 2015, O'Connor sought guidance from Johnson Jr. and Reich about how to manipulate the BNPP Borrowing Base Reports so that they would falsely reflect an excess amount of collateral, rather than the actual deficiency. O'Connor prepared the reports in the first instance, and then received guidance about how to further inflate them with additional phony adjustments. For example, on February 18, 2015, O'Connor sent Johnson Jr. an email, with a copy to Reich, which stated in relevant part:

> On the inventory tab of last week's borrowing base is inventory that has already been sold or partially sold that we will probably have to add back to our inventory because our deficit is so large. Our forward profit is maxed out, so the only areas where we have wiggle room are accounts receivable and inventory. Our borrowings as of last Friday were 310MM, but we borrowed 7MM this week, so we need to come up with a lot of collateral to reach a comfortable excess.

57.     O'Connor's February 18, 2015 email shows that his approach to creating the BNPP Borrowing Base Reports was to start with the desired result (*i.e.*, that the collateral value must exceed the amounts funded) and then work backwards to create records that supported the desired result, with input and guidance from Reich and Johnson Jr. "Wiggle room" was just one of the many euphemisms O'Connor, Reich, Johnson Jr., and others used to describe their fraudulent manipulations of the BNPP Borrowing Base Reports.

58.     Pizzi and Yu also played important roles in the fraud, as demonstrated by other emails sent in 2015. They kept track of the fraud by maintaining Transmar's two sets of books—correct information used internally and the phony "adjusted" information that was reported to the company's lenders.

16

59.     Timothy Johnson gave guidance and instruction to Pizzi and Yu about these matters. For example, Pizzi sent an email on June 30, 2015, to Bernd Herrmann (Euromar's controller), with a copy to Reich and Yu, concerning the two sets of books. Pizzi advised that certain unadjusted financial information did not match the "manual adjustments" to the books. Pizzi sought clarification from Herrmann, Reich, and Yu whether she should upload "actual numbers" or "reported numbers"—referring to the two sets of books maintained by Defendants, *i.e.*, the "adjusted" one reported to the Lenders and the accurate one used by Defendants.

60.     In his reply to Pizzi, Yu, and Reich, dated June 30, 2015, Herrmann opined that Pizzi should upload the reported balances, not the actual ones. Pizzi replied to all recipients and asked Reich to state his views on the matter. Hermann then forwarded Pizzi's email to Timothy Johnson, who replied to Yu and Herrmann a few hours later. Timothy Johnson advised that "if we upload actual financials into the [commodities trading and accounting] system, they will not tie with the financials we have reported to the banks and tax authorities . . ." Thus, Timothy Johnson knew that Transmar was maintaining two sets of books and reporting false results to its lenders. Timothy Johnson knowingly participated in these intentional fraudulent practices.

61.     Yu replied to Timothy Johnson and Herrmann later on June 30, 2015, regarding the plan that was already in place to prevent the bogus transactions from affecting Transmar's set of "actual" books. Yu proposed making manual

adjustments to spreadsheets as a way of not corrupting data stored on Transmar's financial reporting system, thereby keeping the two sets of books separate.

62.    Timothy Johnson replied to Yu and Herrmann on July 1, 2015 as follows:

> "Okay, cool, I'm glad you're not worried.. BUT, same as with the borrowing base and the use of funds, I do think (as CFO..) that you should peel back the onion a bit here sometime soon."

Timothy Johnson ended his email with ":-/"—an emoticon meaning "confused." Timothy Johnson's reference to Yu as "CFO," appears to refer to a plan that Yu would step into the role of Transmar's CFO. Yu assumed duties akin to those performed by a CFO, regardless of whether he formally received that title.

63.    Herrmann replied to Timothy Johnson and Yu on July 1, 2015, stating he was concerned about possible confusion. He explained his understanding that "Tom [Reich] and Gary [O'Connor] have spent/still spent? Significant amounts of their time tying things together." As Hermann acknowledged, Reich and O'Connor did expend a substantial amount of time and energy keeping track of the fraud and tracking the "discrepancy" between the two sets of books. Reich and O'Connor coordinated with others, such as Yu and Pizzi, to ensure that everyone followed the same processes to perpetrate and paper over the fraud.

64.    As the CFO of Euromar, Herrmann was involved in this discussion because Transmar and Euromar entered into fraudulent transactions between the two affiliated companies that were put on Transmar's books, often using intermediaries, to create the appearance of an excess under Transmar's borrowing base.

65.     As shown by the emails cited above, the BNPP Borrowing Base Reports were fraudulently inflated in 2015, and Transmar's financial condition was misrepresented to the banks while the BNPP Credit Facility was in effect, with the knowledge of Transmar's directors and the active participation by Transmar's accounting and finance personnel.

### C. Transmar seeks to convince lenders to participate in the proposed Credit Agreement.

66.     In late 2015, Transmar wanted to enter into a new credit facility to replace the BNPP Credit Facility. Transmar agreed that ABN, which had participated in the BNPP Credit Facility as a lender, would become the administrative agent of the Lenders under the new credit facility (in such capacity, the "Administrative Agent"). Johnson Sr., Johnson Jr., and Reich met with ABN in New York to discuss the new credit facility and negotiate the terms of the proposed Credit Agreement.

67.     The majority of the lenders in the BNPP Credit Facility decided to participate in the new ABN-led facility. The lenders in the first facility who also participated in the new facility are: (i) ABN; (ii) Soc Gen; (iii) BNPP; (iv) Natixis; (v) Macquarie; (vi) Hapoalim; and (vii) IDB (collectively, the "**Continuing Lenders**." Thus, seven of the eight Lenders were Continuing Lenders, while MUFG was the sole new Lender in the ABN-led facility.

68.     While the Continuing Lenders were considering the extent to which they would participate in the new Credit Agreement, they continued to receive weekly BNPP Borrowing Base Reports which overstated the amounts of accounts

receivable, inventory, and net unrealized forward gains against which Transmar could borrow. Reich certified the accuracy of each of the false reports. Transmar also continued to provide misstated monthly financial statements, which Reich also certified.

69.     The Continuing Lenders reasonably relied upon the accuracy of the BNPP Borrowing Base Reports, and the Continuing Lenders and MUFG reasonably relied upon Transmar's financial statements and prior usage of the borrowing base when they decided to participate in the proposed Credit Agreement.

70.     While the negotiations about the proposed Credit Agreement were ongoing in December 2015 and January 2016, Johnson Jr. continued his role as one of the masterminds of the fraud. In late 2015, he orchestrated additional round-trip transactions between Transmar and Euromar to inflate and manipulate the borrowing base, thereby perpetuating the false appearance of Transmar's financial condition and enabling Transmar to enter into the new Credit Agreement.

**D. The Lenders entered into the Credit Agreement, which required certified, accurate Borrowing Base Reports and other financial information.**

71.     In early 2016, in connection with the proposed Credit Agreement, the Plaintiffs collectively decided to loan up to $400 million to Transmar on a *pari passu* basis up to each bank's maximum exposure: (i) ABN, $85 million; (ii) Soc Gen, $70 million; (iii) BNPP, $60 million; (iv) Natixis, $60 million; (v) Macquarie, $45 million; (vi) Hapoalim, $35 million; (vii) MUFG, $30 million; and (viii) IDB, $15 million.

72.     As of February 26, 2016, the Plaintiffs and Transmar entered into the Credit Agreement. A critical part of the Credit Agreement was that Transmar was obligated to provide complete and accurate Borrowing Base Reports to the Plaintiffs.

73.     Section 1.1 of the Credit Agreement defines a Borrowing Base Report as a "report certified by a Responsible Officer, substantially in the form of Exhibit A, with appropriate insertions and schedules, showing the Borrowing Base as of the date set forth therein." The report had to contain backup and schedules to support the summary of the amount of each type of collateral.

74.     These reports were crucial to Plaintiffs, a fact known to the Johnson family and the other Defendants, as shown by Johnson Jr.'s email described above, in which Johnson Jr. declared that it was an "existential threat" if the banks found out that the reports were false and inaccurate.

75.     Section 6.1(c) required Transmar to provide an accurate Borrowing Base Report as a condition precedent to the Plaintiffs' obligation to fund the initial extension of credit to Transmar. As a condition precedent, section 6.1(c) required Transmar to send the Administrative Agent "a fully completed Borrowing Base Report prepared on a pro forma basis showing the Borrowing Base as of a reporting date not more than five (5) Business Days in advance of the Amended and Restated Effective Date, executed by a Responsible Officer."

76.     The Credit Agreement also required Transmar to send the Plaintiffs periodic Borrowing Base Reports and certify their accuracy. Section 7.2 of the

Credit Agreement required Transmar to deliver Borrowing Base Reports twice per month, unless the borrowing base was below a certain threshold, in which case weekly reports were required.

77.    The Plaintiffs' obligation to advance funds to Transmar—at the time of execution of the Credit Agreement and any subsequent advance—was predicated upon delivery of an accurate Borrowing Base Report showing that Transmar had sufficient collateral, an absence of any defaults by Transmar under the Credit Agreement, and certain other conditions. Section 6.2(e) of the Credit Agreement established a formula whereby the Plaintiffs agreed to loan against a specific percentage of the value of each type of asset, subject to certain limits. Transmar was obligated to prepay the principal amounts of the outstanding loans that exceeded the eligible collateral as calculated in the Credit Agreement.

78.    Section 7.1 of the Credit Agreement contains several affirmative covenants by which Transmar promised to provide truthful and complete information about its overall financial condition. Transmar was required to provide its audited financial statements as of year-end 2015 by no later than March 31, 2016. Transmar was also required to provide monthly balance sheet and income statements, each certified as accurate by a Responsible Officer.

79.    In addition to the contractual requirements set forth above, Transmar represented in section 5.15 of the Credit Agreement that all information provided to the Plaintiffs was truthful, complete, and accurate:

> Except as set forth on Schedule 5.15, all factual information, reports and other papers and data with respect to the Borrower or any of its

subsidiaries furnished, and all factual statements and representations made, to the Agents or the Lenders by the Borrower, or on behalf of the Borrower, were at the time the same was furnished or made, when taken together with all such other factual information, reports and other papers and data previously so furnished and all such other factual statements and representations previously so made, complete and correct in all material respects, to the extent necessary to give the Agents and the Lenders true and accurate knowledge of the subject matter thereof in all material respects, and did not, as of the date so furnished or made, contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements contained therein not misleading in light of the circumstances in which the same were made.

80.     In addition to Transmar's representations and warranties, the Credit Agreement contains two other provisions relevant to the damages Defendants caused by their fraud.

81.     The Credit Agreement required Transmar to pay interest at a rate or rates tied to LIBOR. Under section 4.3, the interest rate increased by an additional 2% upon an Event of Default, including a breach of a representation or warranty. Plaintiffs' damages here include interest at the contractual rate.

82.     Section 12.4 of the Credit Agreement replaced and superseded the covenants, representations, and warranties that had been contained in the BNPP Credit Facility, except for Transmar's payment obligations. Accordingly, the Credit Agreement replaced Transmar's prior promises concerning the borrowing base reports that had been provided to the Continuing Lenders during the life of the BNPP Credit Facility. Any representations that Transmar had made about the borrowing base in connection with the BNPP Credit Facility are therefore separate from Transmar's obligations under the Credit Agreement.

### E. The Lenders reasonably relied on the Borrowing Base Reports and other disclosures about Transmar's financial condition.

83.    Before the Credit Agreement was executed, Transmar sent ABN, in its capacity as the Administrative Agent for the Lenders, a Borrowing Base Report, dated as of February 22, 2016. ABN received it in its New York office and posted it for review by the Lenders in an electronic document repository it maintained for distributing documents to Lenders. The February 22, 2016 Borrowing Base Report was accompanied by a Certificate, dated February 26, 2016, by which Reich certified as a Transmar "Responsible Officer" that:

(1)    the information contained herein and the information reflected on the schedules and attachments attached hereto is true and correct as of the date hereof, and is all of the supporting information required to be delivered pursuant to Section 7.2 of the Credit Agreement and the definition of "Borrowing Base Report" under the Credit Agreement;

(2)    all assets included in the calculation of the Borrowing Base, Borrowing Base A and Borrowing Base B are properly included therein and in the proper category of eligible assets (as set forth in the definitions of "Borrowing Base", "Borrowing Base A" or "Borrowing Base B" in the Credit Agreement, as applicable); and

(3)    the Borrower is in compliance with Section 6.2(e) of the Credit Agreement [*i.e.*, that there was available credit based on the computation of the borrowing base].

84.    The signature block under Reich's signature stated his contact information, and also listed Johnson Sr.'s telephone number and email address, demonstrating that Johnson Sr. knew the contents of the Certification and also approved its distribution to Plaintiffs. O'Connor prepared the February 22, 2016 Borrowing Base Report in the first instance and knew that that the values set forth therein were false.

85.     The Borrowing Base Report dated February 26, 2016, was accompanied by an identical Certification signed by Reich, which was dated March 3, 2016. The signature block under Reich's signature stated his contact information, as well as Johnson Sr.'s telephone number and email address. Johnson Sr. knew of the contents of and approved the false Certification.

86.     O'Connor prepared the February 26, 2016 Borrowing Base Report in the first instance, and knew that that the values set forth therein were false. O'Connor's role as the creator of the Borrowing Base Reports in early 2016 is demonstrated by Johnson Jr.'s March 2, 2016 email, in which Johnson Jr. told his father and Reich, "[y]esterday evening I have received two versions of the borrowing base from Gary [O'Connor]. One is 'true' and one 'adjusted.'" This email also shows O'Connor's important role in keeping the two sets of books.

87.     As Directors, Johnson Sr., Mary Johnson, and Timothy Johnson knew about and approved the fraudulent Borrowing Base Reports at the time of the execution and closing of the Credit Agreement, and afterwards. Each knew that Transmar was keeping two sets of books and did nothing to stop the fraud on the company's lenders.

88.     The February 22, 2016 Borrowing Base Report represented that Transmar had at least $30 million of borrowing availability once Plaintiffs advanced the initial loan proceeds. The reports derived that conclusion by: (1) calculating the gross value of various types of eligible assets, (2) multiplying

each type of eligible asset by an agreed-upon percentage of the gross value, subject to certain limits, and then (3) deducting the Lenders' initial funding.

89.     Plaintiffs and their Administrative Agent relied upon the accuracy of the February 22, 2016 Borrowing Base Report before the Lenders funded the initial loan proceeds.

90.     Plaintiffs reviewed the Borrowing Base Report dated as of February 22, 2016, and reasonably believed that it satisfied the condition precedent that they receive a report dated no more than five days before the February 26, 2016 date of the Credit Agreement. On its face, the February 22, 2016 Borrowing Base Report represented that there was sufficient collateral, and the report appeared to comply with the Credit Agreement. Plaintiffs also reasonably relied upon Transmar's year-end 2014 financial statements and unaudited monthly financial statements for 2015 as being accurate and complete.

91.     Based on the representations contained in the February 22, 2016 Borrowing Base Report, as well as other information provided about the borrowing base and Transmar's overall financial condition, Plaintiffs advanced and/or continued initial funding to Transmar in the following amounts on or shortly after the closing of the Credit Agreement:

| Lender | Amount |
|--------|--------|
| ABN | $72,709,371 |
| Soc Gen | $59,878,306 |
| BNP | $51,324,262 |

| Natixis | $51,324,262 |
| Macquarie | $38,493,196 |
| Hapoalim | $29,939,153 |
| MUFG | $25,662,131 |
| IDB | $12,831,065 |
| **Total** | **$342,161,747** |

92.     Plaintiffs advanced these funds based on the representations about the accuracy and completeness of the information that supported the value of the borrowing base, which served as the collateral for the Credit Agreement. Plaintiffs also relied on the monthly balance sheets and income statements provided by Transmar, each of which Reich intentionally and falsely certified as accurate.

93.     Emails that are nearly contemporaneous with Reich's March 3, 2016 Certification of the February 26, 2016 Borrowing Base Report demonstrate beyond question that the report was deliberately overstated. On March 2, 2016, Johnson Jr. sent an email to Johnson Sr. and Reich about the borrowing base. Johnson Jr. openly discussed the fraud and instructed in the subject line, "DO NOT FORWARD – DELETE."

94.     Johnson Jr. explained in his March 2nd email that by early March 2016, the Borrowing Base Reports were overstated by more than $140 million. He admitted that the "***manual adjustments made presumably to keep the BB [borrowing base] in compliance amount to more than 140M USD***." (Emphasis

added.) Johnson Jr. doubted that he, Johnson Sr., and Reich would be able to cover up the fraud because it had grown so large. As Johnson Jr. explained, "I have a sick feeling in my stomach, as such a massive gap [between what was reported to the Lenders and reality] will be extremely difficult to close."

95.     Given that Reich received Johnson Jr.'s email one day before he signed the March 3, 2016 Certification, Reich unquestionably knew that his Certification was deliberately false. The February 22, 2016 Borrowing Base Report misrepresented the gross values of the Eligible Accounts Receivable, Eligible Inventory, and Net Eligible Unrealized Forward Gains—*i.e.*, the three most significant categories of Transmar's assets against which Transmar could borrow.

96.     On March 3, 2016, Johnson Sr. sent a reply to Johnson Jr. alone. Johnson Sr. did not dispute Johnson Jr.'s admissions about the scope of the fraud. His emailed response began simply, "Geez. Worse than I thought." Johnson Sr. went on to say that now he knew why Reich "went white yesterday" when he was asked questions about inventory levels. Johnson Sr. suggested that he and Johnson Jr. meet with Reich and O'Connor to discuss how to implement the necessary fraudulent adjustments.

### F. The fraudulent scheme took many forms to manipulate the borrowing base and Transmar's overall financial condition.

97.     Johnson Jr. and Johnson Sr. instructed Transmar employees to manipulate the borrowing base and financial records in many different ways. Johnson Jr.'s March 2, 2016 email to Johnson Sr. and Reich refers to some of the

many types of "adjustments" the Defendants used to fraudulently inflate the borrowing base.

98.     Johnson Jr. proposed several "manual adjustments" to cover up the $140 million gap in the borrowing base. Johnson Jr. proposed tricks, such as assigning some receivables and inventory from Euromar, "cycling" debt through affiliates, "pre-invoicing" suppliers, and "pre-invoicing" Transmar affiliates.

99.     A few months after the execution of the Credit Agreement, Johnson Jr. approved a more extreme version of the tactic of assigning *some* inventory from Euromar—now he transferred *all* Euromar's inventory. In an email dated May 5, 2016, Johnson Jr. told his father: "Euromar agreed to essentially transfer to Transmar its entire inventory for the 29th cut-off date of Transmar's borrowing base, with the agreement that Transmar would invoice it all back by Euromar's BB date on the 30th."

100.    This particular scheme was designed so the same inventory would appear, nearly simultaneously, to belong to both Transmar and Euromar. But Transmar failed to execute the ploy as designed because Transmar did not invoice the inventory back to Euromar in a timely manner. This failure to return the assets created a risk that Euromar would have a deficit in the borrowing base calculation that *Euromar* prepared for *its* lenders.

101.    Upon learning of this risk, Johnson Sr. was furious, emailing in response: "F-ING A – What now???" Johnson Jr. replied a few hours later, noting

that the failure to return the collateral put Euromar at "risk of fatal deficit." Later on May 5, 2016, Johnson Sr. emailed Johnson Jr.: "Damn we need to be careful."

102.    Another aspect of the scheme involved making fraudulent adjustments to accounts receivable. For example, in an email dated June 14, 2016, Reich emailed Johnson Jr. about accounts receivable that would expire in June, and become too stale to include in the borrowing base. Reich wanted to recharacterize the old accounts receivable as new by entering into new contracts with intermediaries, such as Euromar.

103.    In his June 14, 2016 reply to Reich, Johnson Jr. objected to Reich's plan, not because Johnson Jr. had any objection to committing fraud, but because "its [sic] creating huge problems to keep writing up fictitious contracts and paperwork." In other words, Reich's proposed artifice simply required too much paperwork! Johnson Jr. proposed instead that Transmar reissue old invoices with new dates. Johnson Jr. preferred that tactic instead of Reich's plan, which Johnson Jr. characterized as "fake circles and non-existent last minute intermediary deals."

104.    In yet another iteration of the fraud, Johnson Jr. directed that invoices be reversed to manipulate the borrowing base. In Johnson Jr.'s July 2, 2016 email to Johnson Sr. and Timothy Johnson, discussed above, he admitted that Transmar had recently used this trick. As Johnson admitted, Transmar's prior CFO was "an expert in the game of 'reversing invoices', which was essentially ***another version of shenanigans employed today***." (Emphasis added.)

105.    Transmar also misrepresented its financial condition to Plaintiffs by manipulating the intercompany balance between Transmar and Euromar. Johnson Jr. made or directed others at Transmar to move inventory or accounts receivable to or from Euromar and create an offsetting adjustment in the intercompany balance. In this way, Transmar avoided having to write off uncollected or bogus receivables, thereby making impossible for Plaintiffs to detect the fraud through the operation of reasonable diligence. Plaintiffs did not have access to Euromar's books on a transaction-by-transaction basis, and were not able to compare whether Transmar and Euromar recorded their transactions consistently

106.    When choosing between their various stratagems to inflate Transmar's borrowing base and misrepresent the company's true financial condition, Defendants gave paramount consideration to how best to avoid detection by the Lenders.

107.    For example, in an email chain that began on March 3, 2016, Reich, Johnson Jr., Johnson Sr., and Pizzi deliberated about which of several ruses to use. The chain began with Reich's email to the group, in which he inquired about what to do with a "loss-making" transaction that had been put on the books, at least in part, "as a way to create more borrowing base capacity." Reich proposed getting rid of the loss through a paper transaction with Euromar, but without creating a bona fide obligation for Euromar to repay Transmar. In his response to the group on March 5, 2016, Johnson Jr. suggested that Transmar cancel the contract and apply the profit to the Euromar intercompany balance. Alternatively, Johnson Jr.

suggested that Transmar could "convert" the Euromar contract to one with a different counterparty. In either event, Johnson Jr. noted that: "We will need to write up a shit load of new contracts as per previous emails anyway." Johnson Sr. responded just to Reich on March 6, 2016, and agreed that Transmar should cancel the contract, ideally using the gain from cancelling the loss-making contract to adjust the balance between Transmar and Euromar. But Johnson Sr. asked if the banks would discover the sham transaction, emailing Reich, "how closely do the banks connect the dots on that?"

108.   On March 7, 2016, in response to Johnson Sr.'s email, Reich reassured Johnson Sr. that they could cancel the contract and avoid detection because additional measures were in place to deceive the collateral agent selected by the Administrative Agent. Reich told Johnson Sr. that the Administrative Agent's auditor:

> will ask to see the interco balance with Euromar to be sure it is as we will be representing (i.e., approx. $15mm). It is currently $72mm which is why we were discussing entries last Friday to bring it back to $15mm and keeping it at that level going forward.

109.   The fraud took so many forms and involved so many transactions that it was difficult for accounting personnel, such as Pizzi, to keep track of what was real and what was fake. She emailed Johnson Sr. on March 1, 2015, telling him that she was "unsure if some of the P&L transactions that are picked up in the financial statements are real." She proposed that the accounting group keep track of the fake borrowing base transactions separately so they did not disrupt the real set of books.

110.    Johnson Sr. replied to Pizzi's email later that afternoon, copying Johnson Jr., Reich, and Carrie McDermott (a Transmar accounting employee), and advising Pizzi that these type of transactions were being flagged by accounting personnel.

111.    Reich, O'Connor, and Pizzi also played important roles in implementing the specific fraudulent ploys, from the early days of the fraud. For example, a chain of emails exchanged on March 26, 2015, reflects the practice of entering into contracts with Euromar for the purpose of manipulating Transmar's borrowing base. At 9:41 a.m., Reich emailed Carrie McDermott and Alex Zanellato at Transmar, with a copy to O'Connor, McNamara, and Pizzi. Reich emailed: "We need to establish a purchase contract in Cats [Transmar's commodities system] so Euromar sell us back the 500 mts of butter, which amounts to over $3mm we need to get into our borrowing base as of last Friday." O'Connor replied to all recipients at 10:38 a.m., telling Zanellato what contract and purchase order numbers to use for this phantom transaction. O'Connor's reply shows that he actually directed other employees in how to implement fraudulent transactions.

112.    O'Connor also played an important role in concealing the fraud from the Plaintiffs. He sent an email on August 21, 2016, to Johnson Sr., Reich, and Alberto Nacer (Transmar Ecuador) that forwarded an email O'Connor had received from the Lenders' collateral auditor. O'Connor asked Johnson Sr. and Reich how to respond. As established by the email chain, the Lenders' collateral auditor had been unable to reconcile Transmar's reported borrowing base with a summary of

Transmar's trading positions. O'Connor commented that the auditor's question had caught him by surprise because the collateral auditor during the BNPP Credit Facility had not tried to reconcile the different data points. O'Connor asked for help from Johnson Sr., Reich, and Alberto Nacer, and suggested that: "we need to find the most plausible excuse that does not cause him to peel back the onion further." Thus, O'Connor actively participated in knowingly concealing the fraud from the Lenders and their collateral auditor.

H. **The Lenders advanced additional funds to Transmar, and refrained from accelerating amounts already outstanding, based on weekly Borrowing Base Reports and the periodic financial reports.**

113.    From the execution of the Credit Agreement in early 2016 through early November 2016, ABN received weekly Borrowing Base Reports as the Lenders' Administrative Agent. ABN received these reports in its New York office and posted them and the accompanying Certificates for review by the Lenders. Reich signed each of the Certificates, which falsely certified the accuracy of the Borrowing Base Reports.

114.    Each Borrowing Base Report contained representations about the amount of Eligible Accounts Receivable, Eligible Inventory, and Net Eligible Unrealized Forward Gains, as those terms were defined in the Credit Agreement. These were the three main categories of Transmar's assets that qualified as collateral under the Credit Agreement. The reports also represented what the Borrowing Availability was of the date of each report, *i.e.*, how much additional money Transmar was entitled to request under the Credit Agreement. The

representations in the Borrowing Base Reports are summarized in the following chart:

| As of Date of Report | Date of Certificate | Gross Amount of Eligible Accounts Receivable | Gross Amount of Eligible Inventory | Gross Amount of Eligible Net Unrealized Forward Gains | Borrowing Availability |
|---|---|---|---|---|---|
| 02/22/16 | 02/26/16 | $ 75,495,400 | $ 283,403,310 | $ 172,713,891 | $ 30,000,000 |
| 02/29/16 | 03/03/16 | $ 73,680,423 | $ 277,495,560 | $ 165,687,737 | $ 15,000,000 |
| 03/07/16 | 03/10/16 | $ 74,962,088 | $ 279,459,334 | $ 155,861,778 | $ 8,500,000 |
| 03/11/16 | 03/17/16 | $ 83,608,778 | $ 276,196,040 | $ 159,916,254 | $ 4,500,000 |
| 03/18/16 | 03/23/16 | $ 82,639,734 | $ 277,722,598 | $ 162,202,142 | $ 4,500,000 |
| 03/25/16 | 03/31/16 | $ 94,333,468 | $ 251,271,479 | $ 161,842,929 | $ 4,500,000 |
| 03/31/16 | 04/06/16 | $ 75,462,726 | $ 255,826,438 | $ 164,415,789 | $ 4,500,000 |
| 04/08/16 | 04/13/16 | $ 77,059,341 | $ 261,005,442 | $ 164,678,356 | $ 44,500,000 |
| 04/15/16 | 04/21/16 | $ 92,081,776 | $ 261,513,325 | $ 161,589,448 | $ 44,500,000 |
| 04/22/16 | 04/28/16 | $ 94,634,295 | $ 243,357,999 | $ 165,280,720 | $ 44,500,000 |
| 04/29/16 | 05/06/16 | $ 88,775,710 | $ 247,930,880 | $ 164,551,345 | $ 44,500,000 |
| 05/06/16 | 05/12/16 | $ 85,791,882 | $ 249,010,129 | $ 166,443,705 | $ 2,000,000 |
| 05/13/16 | 05/20/16 | $ 80,120,237 | $ 255,588,377 | $ 166,600,421 | $ 2,000,000 |
| 05/20/16 | 05/26/16 | $ 79,192,513 | $ 258,984,213 | $ 170,052,251 | $ 2,000,000 |
| 05/27/16 | 06/03/16 | $ 77,541,126 | $ 262,690,177 | $ 173,973,209 | $ 100,000 |
| 06/03/16 | 06/08/16 | $ 78,669,988 | $ 281,427,251 | $ 162,052,282 | $ 100,000 |
| 06/10/16 | 06/15/16 | $ 76,628,129 | $ 281,900,795 | $ 164,013,807 | $ 100,000 |
| 06/17/16 | 06/23/16 | $ 74,961,738 | $ 283,973,916 | $ 168,303,741 | $ 100,000 |
| 06/24/16 | 06/30/16 | $ 62,048,344 | $ 287,308,014 | $ 163,042,046 | $ 100,000 |
| 07/01/16 | 07/08/16 | $ 72,281,176 | $ 292,278,106 | $ 166,224,165 | $ 100,000 |
| 07/08/16 | 07/12/16 | $ 65,050,918 | $ 300,188,582 | $ 168,339,642 | $ 100,000 |
| 07/15/16 | 07/22/16 | $ 69,279,859 | $ 301,955,236 | $ 165,695,124 | $ 100,000 |
| 07/22/16 | 07/28/16 | $ 68,472,894 | $ 301,504,569 | $ 160,936,558 | $ 100,000 |
| 07/29/16 | 08/05/16 | $ 67,968,686 | $ 301,545,673 | $ 161,494,422 | $ 100,000 |

| 08/05/16 | 08/11/16 | $ | 53,000,617 | $ | 294,823,741 | $ | 155,127,369 | $ | 100,000 |
| 08/12/16 | 08/19/16 | $ | 57,142,756 | $ | 277,627,709 | $ | 149,654,652 | $ | 100,000 |
| 08/19/16 | 08/25/16 | $ | 58,020,580 | $ | 281,985,088 | $ | 168,984,911 | $ | 100,000 |
| 08/26/16 | 09/01/16 | $ | 56,203,888 | $ | 280,819,251 | $ | 174,809,278 | $ | 100,000 |
| 09/02/16 | 09/09/16 | $ | 69,092,976 | $ | 267,568,677 | $ | 184,083,186 | $ | 100,000 |
| 09/09/16 | 09/19/16 | $ | 67,116,069 | $ | 269,190,104 | $ | 176,926,317 | $ | 100,000 |
| 09/16/16 | 09/26/16 | $ | 73,317,024 | $ | 257,322,565 | $ | 178,028,612 | $ | 100,000 |
| 09/23/16 | 10/03/16 | $ | 78,579,331 | $ | 261,116,350 | $ | 184,375,022 | $ | 100,000 |
| 09/30/16 | 10/11/16 | $ | 79,424,801 | $ | 262,196,784 | $ | 184,017,229 | $ | 100,000 |
| 10/07/16 | 10/17/16 | $ | 76,377,953 | $ | 259,686,344 | $ | 193,470,380 | $ | 100,000 |
| 10/14/16 | 10/24/16 | $ | 74,461,994 | $ | 258,817,257 | $ | 204,880,198 | $ | 100,000 |
| 10/21/16 | 10/28/16 | $ | 77,138,107 | $ | 255,011,213 | $ | 198,860,617 | $ | 100,000 |
| 10/28/16 | 11/07/16 | $ | 76,000,545 | $ | 253,140,927 | $ | 209,134,512 | $ | 100,000 |

115.    The Lenders also received the monthly financial statements required by the Credit Agreement during this time period, each of which Reich falsely certified as accurate. Reich signed Certifications dated March 23, 2016, May 19, 2016, July 26, 2016, August 16, 2016, and September 21, 2016, each of which falsely represented Transmar's financial condition and the document's compliance with the terms of the Credit Agreement.

116.    The Lenders loaned additional funds to Transmar, and refrained from accelerating amounts already outstanding, in reliance upon the representations in the Certificates, the Borrowing Base Reports, and the representations about Transmar's overall financial condition. Each of the Lenders reviewed the Borrowing Base Reports when they were posted, and each Lender monitored whether the reports supported the extension of credit to Transmar. The chart below reflects the

36

aggregate amount of credit each Lender had advanced (rounded to the nearest hundred thousand) as of the end of each month from February through October 2016.

| Lender | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. | Oct. |
|--------|------|------|------|-----|------|------|------|-------|------|
| ABN | $85.12M | $75.5M | $76.4M | $77.9M | $76.4M | $76.4M | $76.4M | $76.4M | $76.4M |
| Soc Gen | $57.7M | $62.2M | $62.6M | $62.6M | $62.9M | $62.9M | $62.9M | $62.9M | $62.9M |
| BNPP | $49.5M | $53.3M | $53.7M | $53.7M | $53.9M | $53.9M | $53.9M | $53.9M | $53.9M |
| Natixis | $49.5M | $53.3M | $53.7M | $53.7M | $53.9M | $53.9M | $53.9M | $53.9M | $53.9M |
| Macquarie | $37.1M | $39.9M | $40.2M | $40.2M | $40.4M | $40.2M | $40.2M | $40.2M | $40.2M |
| Hapoalim | $28.8M | $31.1M | $31.3M | $31.3M | $31.4M | $31.4M | $31.4M | $31.4M | $31.4M |
| MUFG | $24.7M | $26.6M | $26.8M | $26.8M | $26.9M | $26.9M | $26.9M | $26.9M | $26.9M |
| IDB | $12.3M | $13.3M | $13.4M | $13.4M | $13.4M | $13.4M | $13.4M | $13.4M | $13.4M |
| **Total** | **$345.0M** | **$355.5M** | **$358.0M** | **$359.9M** | **$359.9M** | **$359.9M** | **$359.9M** | **$359.9M** | **$359.9M** |

As reflected in the chart above, Transmar did not seek additional funding from June through October 2016. During that period of time, Transmar's finances and the borrowing base appeared stable based on the representations in the Borrowing Base Reports and the monthly financial reports.

**G. The fraud unraveled in late 2016.**

117.    By late October 2016, the gap between the real financial records and the "adjusted" information delivered to the Plaintiffs had expanded, making it increasingly difficult for Defendants to paper over it. Nathaniel Durant, who had been stationed at a Transmar-affiliated company in Africa, was transferred to Transmar and assumed a central role in managing the company's financial affairs and communicating with the Lenders.

118.   Durant quickly saw that Transmar's financial reporting did not add up and that there was no support for invoices and positions on Transmar's books. He realized that the Borrowing Base Reports did not match the company's internal records.

119.   At or around the time that Durant was increasing his personal involvement with Transmar, Johnson Jr. wanted to take additional measures to conceal the deepening fraud. But Durant, Reich, and Pizzi did not agree that Johnson's plan was the best approach.

120.   On October 25, 2016, Johnson Jr. sent an email to Pizzi, with a copy to Timothy Johnson, Reich, Yu, Durant, and Johnson Sr. The email proposed several transactions, which Johnson Jr. believed were important "to avoiding accusations of fraud" by the Plaintiffs.

121.   Pizzi disagreed with Johnson Jr.'s suggestions in her October 26, 2016 reply to the group. She stated that Johnson Jr.'s suggestion would have the net effect of forgiving loans to Euromar with Transmar getting nothing in return, while causing Transmar to trip its covenants with its lenders, which would lead the company's auditors to demand a write-down in the following year.

122.   Later that same day, Johnson Jr. replied to the recipients of Pizzi's email and insisted that his suggestion was best among several bad choices. He rhetorically asked: "Is fictitious inventory which will be discovered next week better or worse than receivables that might get written off by auditors in March/April next year." He further criticized Pizzi's proposal as: "[c]reating inventory from thin

air to fill the gaps created by shifting anything but the kitchen sink onto the intercompany [balance]."

123.    After receiving Pizzi's email, Johnson Jr. complained to his father by email on October 26, 2016, that Pizzi and Reich were not following Johnson Jr.'s instructions: "I wasted 15-20 emails today going back and forth with Nancy and Tom over essentially the same issue that's been discussed for weeks, without any movement whatsoever. The functionaries are refusing to act either based on your explicit instruction or implicit support (through silence) through their baseless/stupid rationales for not implementing my proposals."

124.    Johnson Jr. explained to his father in another email sent later on October 26, 2016 that Johnson Jr.'s "plan" was the best course because the alternative—shifting receivables onto the intercompany balance between Transmar and Euromar balance—was the equivalent of a confession of fraud. Johnson Jr. wanted Reich to follow his direction because: "[u]nless he [Reich] is willing to admit to fraud on a colossal scale, in the process taking you, Transmar, and Euromar down with him, what is there to discuss?" This echoed the concern Johnson Jr. had expressed to his father in an email a few hours earlier, when Johnson Jr. noted that moving receivables to Euromar is "tantamount to [Transmar's] suicide and worse than that, its [sic] murder-suicide in that its [sic] an attempt to drag Euromar down while Transmar commits suicide by admitting to systemic fraud."

125.    On October 27, 2016, Johnson Sr. replied to Johnson Jr.'s email and copied Durant, Reich, and Timothy Johnson. Johnson Sr. did not believe, as

Johnson Jr. had suggested, that it was impossible to change the reported intercompany balance. Johnson Sr. emailed: "How careful do we need to be here—can we build the right story about this----can we not agree 33 mil [as the intercompany balance] but use as placeholder and not endanger the 'plan.'"

126.    There was no consensus about what to do. On November 1, 2016, Durant sent Johnson Jr. sent a lengthy email outlining his suggestions to address Transmar's increasingly dire situation. Durant explained that he understood "all of the machinations we are implanting to get through this current crisis," but Durant opined that Transmar was simply delaying the day of reckoning.

127.    In Johnson Jr.'s response later the same day, he agreed in part, but disagreed in other respects. He agreed with Durant about buying more time with the Plaintiffs, emailing:

> Most of the machinations, (good word!) . . . [resulted in] kicking the can down the road, but I don't see any alternative to buying time. "Fixing stuff" is absolutely necessary, but it can't be done wholesale and can better be accomplished when banks anxiety has calmed and we are not under existential scrutiny.

128.    But Johnson Jr. disagreed with other parts of Durant's proposals because it would provide too much information to the Plaintiffs. Johnson Jr. emailed: "A full confession [to the banks] would only seal the fate of the current shareholders and leave nothing behind to operate going forward. I view this [Durant's] proposal as tantamount to tossing in the towel."

129.    Durant escalated the dispute between him and Johnson Jr. to Mary Johnson, who was a director of Transmar. Durant suggested that Johnson Jr. should either resign or be fired. Later on November 1, 2016, Mary Johnson emailed

Johnson Sr. and Timothy Johnson, asking if it would be possible to fire Johnson Jr. Once again, none of the directors took any action to stop the fraud.

130.    Durant stuck to his plan, which consisted of making a partial disclosure to the Lenders, while continuing to cover up the fraud. He arranged a meeting with the Plaintiffs on November 23, 2016. At the meeting, Durant disclosed that there was a $100 million "gap" in the borrowing base. As of November 23, 2016, the Lenders had collectively advanced $359.9 million as of the October 28, 2016 Borrowing Base Report. At the November 23rd meeting, Durant stated that there was only $258.8 million of eligible collateral, *i.e.*, approximately $100 million less than the amount the Lenders had already funded.

131.    Johnson Jr. was furious when he learned after the fact about Durant's partial disclosure to the Lenders. In an email Johnson Jr. sent to Johnson Sr. on November 26, 2016, he complained that what Durant had disclosed about how Transmar planned to fill the gap was a "total departure" from the strategy discussed between Johnson Sr. and Johnson Jr. Johnson Jr. told his father:

> MOST IMPORTANTLY – I PROPOSED A PLAN TO ELIMINATE ANY FRAUDULENT ENTRIES AND COMPLY WITH THE TERMS OF THE TRANSMAR CREDIT AGREEMENT.

(All caps in original.) Later in the same email, Johnson Jr. said that he formally resigned from Transmar in response to Durant's presentation.

132.    After the November 23rd meeting, the Lenders asked further questions about how the borrowing base had diminished so rapidly, but received incomplete or obfuscatory answers. It appeared that one reason why the Lenders were having trouble obtaining information from Transmar was that its employees

41

were preoccupied by the demise of Euromar, which commenced insolvency proceedings in Germany on December 2, 2016.

### H. Transmar files for bankruptcy.

133.   On December 31, 2016, Transmar filed a bankruptcy petition under Chapter 11 in the Southern District of New York.

134.   As of the filing of the bankruptcy petition, the outstanding principal balance owed to the Lenders was approximately $360 million, plus accrued interest. The chart below reflects the amounts owed to each Lender.

| Lender | Principal owed, as of 12/31/16 | Interest owed, as of 12/31/16 | Total |
|---|---|---|---|
| ABN | $75,875,621 | $948,409.64 | $76,824,030.64 |
| Soc Gen | $62,485,806 | $781,043.23 | $63,266,849.23 |
| BNP | $53,559,262 | $669,465.63 | $54,228,727.63 |
| Natixis | $53,559,262 | $669,465.33 | $54,228,727.33 |
| Macquarie | $40,169,446 | $502,099.22 | $40,671,545.22 |
| Hapoalim | $31,242,903 | $390,521.61 | $31,633,424.61 |
| MUFG | $26,779,631 | $334,732.81 | $27,114,363.81 |
| IDB | $13,389,815 | $167,366.41 | $13,557,181.41 |
| **Total** | $357,061,747 | $4,463,104.18 | $361,524,849.88 |

135.   During the bankruptcy proceedings, Transmar produced emails that revealed that its Borrowing Base Reports had been fictitious throughout the existence of the Credit Agreement. After the Lenders reviewed the emails, on May 23, 2017, ABN, acting as agent for the Lenders, moved to convert the Chapter 11 bankruptcy case to one under Chapter 7 of the Bankruptcy Code.

136.    On July 26, 2017, the Court entered an Order granting ABN's motion and converting the case. Alan Nisselson was appointed as Transmar's Chapter 7 trustee.

137.    In light of the ongoing expenses of the bankruptcy proceedings, along with the absence of material assets, it is very unlikely that there will be any material recovery of the more than $360 million lost by the Lenders in connection with the Credit Agreement.

138.    Recoveries on assets have been minimal thus far. Transmar offered to sell many of its forward contracts through an auction, but it did not receive any qualified bids, leading to a sale to a stalking horse bidder for a bargain basement price of $2 million. This pales in comparison to the reported net value of forward transactions of more than $200 million that Transmar reported to the Lenders in late October 2016.

139.    By this action, the Plaintiffs seek to recover the damages caused by Defendants' fraud. These damages include the more than $360 million advanced by the Plaintiffs under the Credit Agreement.

## FIRST CAUSE OF ACTION

**Fraud by misrepresentations**
**(All Plaintiffs against Johnson Sr., Johnson Jr., Timothy Johnson, Mary Johnson, Reich, and O'Connor)**

140.    The foregoing paragraphs are realleged herein.

141.    Johnson Sr., Johnson Jr., Timothy Johnson, Mary Johnson, Reich, and O'Connor (the "**Fraud Defendants**") are responsible for knowingly false misrepresentations of material fact made to the Lenders about Transmar's

43

financial condition and its borrowing base. The Fraud Defendants knew about and participated in the creation and dissemination of the false reports about Transmar's borrowing base and Transmar's false monthly and annual financial statements.

142.   The representations about Transmar's financial condition and the borrowing base were false because Transmar's assets and collateral were overstated. Transmar's monthly and annual financial statements materially misstated the amount of the company's inventory, the Transmar-Euromar balance, and the value of the forward transactions, among other deficiencies.

143.   Johnson Sr. knew about and participated in the fraudulent representations and instructed Transmar employees to implement them. His role in the misrepresentations is established by, *inter alia*: (i) his knowledge of the falsity of the Borrowing Base Reports and his instructions to Reich to certify the false reports; (ii) listing his contact information on each of the false Certifications of the Borrowing Base Reports; (iii) his instructions to Transmar employees about the methods they should use to falsify the company's financial information; (iv) his role as an officer and director of Transmar; (v) the February 15, 2015 email concerning the manipulation of Transmar's books and positions; (v) the August 15-16, 2015 emails concerning the practice of sending inaccurate borrowing base reports, the discovery of which posed an "existential threat" to Transmar; (vi) the March 2, 2016 email concerning the two versions of the borrowing base; (vii) the March 2, 2016 email concerning the $140 million overstatement of the borrowing base; (viii) the

March 3-7, 2016 email chain concerning tactics to inflate the borrowing base and avoid detection by the Lenders; (ix) the March 1, 2015 emails about keeping tracking of the two sets of books; (x) the May 5, 2016 email concerning moving Euromar's inventory to Transmar and back; (xi) the July 2, 2016 emails concerning the 6-7 year history of the fraud; (xii) the August 1-3, 2015 email chain concerning the origins of the fraud; (xiii) the October 25-27, 2016 emails about efforts to avoid detection of the fraud; and (xiv) the November 26, 2016 emails concerning Durant's presentation to the Lenders.

144.   Johnson Jr. knew about and participated in the fraudulent representations and instructed Transmar employees about how to implement them. Johnson Jr. functioned as a de facto officer of Transmar by directing corporate strategy and negotiating transactions on behalf of Transmar with counterparties and the Lenders and/or other parties who provided financing to Transmar. Johnson Jr.'s role as a de facto executive officer is also demonstrated by his ability to instruct and direct Transmar employees. Johnson Jr.'s status as a de facto officer is also established by the resignation email he sent late in 2016 as the fraudulent scheme was collapsing.

145.   Johnson Jr. knew about and participated in the fraudulent representations and provided instructions to Transmar employees concerning the fraudulent representations, as established by, *inter alia*: (i) his instruction to Reich to certify the Borrowing Base Reports; (ii) the February 15, 2015 email concerning the manipulation of Transmar's books and positions; (iii) the February 18, 2015

email concerning the manipulation of the borrowing base reports; (iv) the August 1-3, 2015 email chain concerning the origins of the fraud; (v) the August 15-16, 2015 emails concerning the practice of sending inaccurate borrowing base reports, the discovery of which posed an "existential threat" to Transmar; (vi) the March 2, 2016 email concerning the two versions of the borrowing base; (vii) the March 2, 2016 email concerning the $140 million overstatement of the borrowing base; (viii) the March 3-7, 2016 email chain concerning tactics to inflate the borrowing base; (ix) the March 1, 2015 emails about distinguishing between real and fake transactions in the two sets of books; (x) the May 5, 2016 email concerning moving Euromar's inventory to Transmar and back; (xi) the June 14, 2016 email concerning refreshing stale accounts receivable; (xii) the July 2, 2016 emails concerning the 6-7 year history of the fraud; (xiii) the October 25-27, 2016 emails about efforts to avoid detection of the fraud; (xiv) the November 1, 2016 emails about the various plans to avoid detection of the fraud; and (xv) the November 26, 2016 emails concerning Johnson Jr.'s reaction to Durant's presentation to the Lenders.

146.    Timothy Johnson knew about and participated in the fraudulent representations as a director of the company who did not take any steps to stop the fraud. In addition, he knew about and participated in the fraudulent representations, as established by, *inter alia:* (i) the June 30-July 1, 2015 emails concerning Transmar's two sets of books; (ii) the August 15-16, 2015 emails concerning the practice of sending inaccurate borrowing base reports, the discovery

of which posed an "existential threat" to Transmar; (iii) the October 25-27, 2016 emails about efforts to avoid detection of the fraud; and (iv) the November 1, 2016 email about the various plans about what to disclose to the Lenders.

147.   Mary Johnson knew about and participated in the fraudulent representations as a director of the company who did not take any steps to stop the fraud. Transmar identified Mary Johnson as one of the company's officers who was authorized to execute documents required by the Credit Agreement. In addition, she knew about and participated in the fraudulent representations, as established by, *inter alia*: (i) the August 15-16, 2015 emails concerning the practice of sending inaccurate borrowing base reports, the discovery of which posed an "existential threat" to Transmar; and (ii) the November 1, 2016 email about the various plans about what to disclose to the Lenders.

148.   Reich made false representations directly to the Lenders by signing the false Certifications of borrowing base reports and monthly financial statements as an "Authorized Officer." In addition, he knew about and participated in the fraudulent representations, as established by, *inter alia*: (i) the March 1, 2015 emails about distinguishing between real and fake transactions in the two sets of books; (ii) the March 26, 2015 email concerning the practice of entering into fake transactions with Euromar; (iii) the June 30-July 1, 2015 emails concerning Transmar's two sets of books; (iv) the March 2, 2016 email concerning the two versions of the borrowing base; (v) the March 2, 2016 email concerning the $140 million overstatement of the borrowing base; (vi) the March 3-7, 2016 email chain

concerning tactics to inflate the borrowing base; (vii) the June 14, 2016 email concerning refreshing stale accounts receivable; (viii) the August 21, 2016 emails concerning how to respond to the collateral auditor's questions; and (ix) the October 25-27, 2016 emails about how to avoid detection of the fraud.

149.   O'Connor created the false Borrowing Base Reports and made decisions concerning adjusting the reports and manipulating how Transmar's borrowing base was reported to the Lenders. O'Connor knew about and participated in the fraudulent representations, as established by, *inter alia*: (i) the February 18, 2015 emails about manipulating the borrowing base; (ii) the March 26, 2015 email concerning the practice of entering into fake transactions with Euromar; (iii) the March 2, 2016 emails concerning the two versions of the borrowing base reports; and (iv) the August 21, 2016 emails concerning how to respond to questions posed by the Lenders' collateral auditor.

150.   The Lenders reasonably relied on the Fraud Defendants' misrepresentations of material fact concerning Transmar's borrowing base and the company's overall financial condition.

151.   The Fraud Defendants' misrepresentations caused the Lenders to enter into the Credit Agreement and loan funds to Transmar. But for the Fraud Defendants' conduct, the Lenders would not have entered into the Credit Agreement, and the Lenders would not have advanced funds in connection with the Credit Agreement.

152.   The Fraud Defendants' misrepresentations were the direct and proximate cause of the losses suffered by the Lenders. The Fraud Defendants were responsible for preparing, distributing, and approving the Borrowing Base Reports, which were designed to control the amounts borrowed by Transmar and to protect the Lenders so that they did not loan more money than was secured by collateral. The Borrowing Base Reports also caused the Lenders to refrain from accelerating the outstanding amounts. As a direct and proximate result of the Fraud Defendants' fraud, the Lenders have suffered damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### Fraud by nondisclosure
### (All Plaintiffs against Johnson Sr., Johnson Jr., Timothy Johnson, Mary Johnson, Reich, and O'Connor)

153.   The foregoing paragraphs are realleged herein.

154.   The Fraud Defendants had a duty to disclose material facts regarding the Borrowing Base Reports and other reports about Transmar's overall financial condition. The Fraud Defendants had a duty to disclose to the Lenders that they had manipulated and falsified records to overstate the borrowing base and misrepresent Transmar's financial condition.

155.   The Fraud Defendants had superior knowledge about the true status and value of the borrowing base and the bogus transactions used to manipulate the Borrowing Base Reports and Transmar's overall financial condition. In addition, the Fraud Defendants had superior knowledge because they knew about and had control over Euromar's books and records, but the Lenders were unable to compare

how Transmar and Euromar each recorded inter-company transactions. The Fraud Defendants also had superior knowledge of their secret emails and conversations by which they coordinated the preparation of the Borrowing Base Reports and the company's two sets of books.

156.   The Fraud Defendants' superior knowledge rendered it unfair for Defendants to cause the Lenders to enter into the Credit Agreement and advance funds to Transmar without disclosing the true facts concerning Transmar's borrowing base and financial condition.

157.   Each of the Fraud Defendants had superior knowledge of the fraudulent information concealed from the Lenders, as established, *inter alia*, by the emails and documents summarized as to each Fraud Defendant in connection with the First Cause of Action set forth above.

158.   The Fraud Defendants had a duty to disclose accurate information about Transmar's borrowing base and financial condition because they knew that the Lenders were relying upon accurate information as a prerequisite for their extensions of credit to Transmar and forbearance from accelerating the loan. It was improper for the Fraud Defendants to take advantage of the Lenders' ignorance about the true state of the collateral and Transmar's financial condition.

159.   Johnson Sr., Mary Johnson, and Timothy Johnson owed a duty of disclosure as directors of Transmar, and should have provided complete and accurate information to the Lenders about the borrowing base and Transmar's overall financial condition.

160.    The Fraud Defendants knowingly concealed the existence of the foregoing material facts from the Lenders with the specific intent that they rely on the fraudulent Borrowing Base Reports and misstated financial statements. The foregoing material facts were not known to the Lenders and could not have discovered through the exercise of ordinary diligence. The Lenders had no way of knowing that the Borrowing Base reports contained false information and reflected transactions that had been entered on the books for the purpose of deceiving the Lenders and misrepresenting Transmar's true financial condition. The Lenders had no way of discovering through ordinary diligence the material misstatement of Transmar's financial statements and the borrowing base.

161.    The Lenders actually and justifiably relied on the Defendants' omissions about the borrowing base and Transmar's financial condition. Had the Fraud Defendants disclosed that: (i) the Borrowing Base Reports overstated Transmar's borrowing base; (ii) the Borrowing Base Reports reflected bogus transactions designed to inflate the borrowing base; or (iii) Transmar's financial statements were materially misstated, the Lenders would not have participated as Lenders in the Credit Agreement and would not have not loaned funds to Transmar under the Credit Agreement. The Lenders also would have accelerated the loan before collateral was depleted.

162.    As a direct and proximate cause of the Fraud Defendants' fraudulent omissions, the Lenders have suffered damages in an amount to be proven at trial.

## **THIRD CAUSE OF ACTION**

### **Negligent misrepresentation**
### **(All Plaintiffs against Johnson Sr.,**
### **Johnson Jr., Reich, and O'Connor)**

163.   The foregoing paragraphs are realleged herein.

164.   Johnson Sr., Johnson Jr., Reich, and O'Connor are responsible for the representations made to the Lenders about Transmar's borrowing base and its overall financial condition. Reich made statements to the Lenders by signing the Certifications. Johnson Sr. is responsible for the false Certifications because his contact information is set forth on the Certifications, and he directed Reich to sign them. Johnson Sr., Johnson Jr., Reich, and O'Connor are also responsible for the misrepresentations made to the Lenders for the additional reasons set forth in connection with the First Cause of Action.

165.    Johnson Sr., Johnson Jr., Reich, and O'Connor had a duty to speak truthfully and provide complete information about the collateral to the Lenders. In addition to the obligation to convey truthful and complete information imposed by the Credit Agreement, these Defendants had superior knowledge, not readily available to Plaintiffs, concerning the true state of Transmar's borrowing base and financial records. These Defendants knew that the Lenders were relying on the inaccurate information provided to the Lenders.

166.   In breach of their duties, Johnson Sr., Johnson Jr., Reich, and O'Connor did not exercise due care to make sure that their statements to the Lenders were accurate and complete concerning the borrowing base and Transmar's financial condition.

167.    The Lenders each reasonably relied upon the accuracy of the Borrowing Base Reports, the annual and monthly financial statements, and other information about Transmar's financial condition before the Lenders entered into the Credit Agreement and before they loaned money to Transmar.

168.    As a direct, proximate, and foreseeable result of the wrongful conduct, Plaintiffs have suffered damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### Conspiracy to commit fraudulent inducement
### (All Plaintiffs against all Defendants)

169.    The foregoing paragraphs are realleged herein.

## The Continuing Lenders were induced to increase their participation in the Credit Agreement.

170.    The Continuing Lenders participated as lenders in the BNPP Credit Facility. As of January 2016, each Continuing Lender had advanced the following amounts to Transmar: (i) ABN, $54,765,840.22; (ii) Soc Gen, $39,118,457.30; (iii) BNPP, $58,677,685.95; (iv) Natixis, $27,871,900.83; (v) Macquarie, $37,651,515.15; (vi) Hapoalim, $23,471,074.38; and (vii) IDB, $12,224,517.91.

171.    Through January 2016, Transmar provided the BNPP Borrowing Base Reports to the Continuing Lenders. The form of the BNPP Borrowing Base Reports was different than the form of the Borrowing Base Reports required by the Credit Agreement. The BNPP Borrowing Base Reports were designed to comply with the requirements set forth in the BNPP Credit Facility, which were different than the requirements in the Credit Agreement.

172.    The BNPP Borrowing Base Reports contained certifications signed by Reich on behalf of Transmar. Each of the reports represented that the borrowing base complied with the requirements set forth in the BNPP Credit Facility.

173.    In late 2015 and early 2016, the Continuing Lenders received BNPP Borrowing Base Reports, each certified by Reich on the following dates: (i) December 10, 2015; (ii) December 18, 2015, (iii) December 29, 2015; (iv) December 31, 2015; (v) January 7; 2016; (vi) January 12, 2016; (vii) January 21, 2016, (viii) January 27, 2016; (ix) February 4, 2016; (x) February 11, 2016; and (xi) February 19, 2016. These BNPP Borrowing Base Reports represented that the value of the eligible inventory, eligible accounts receivable, and eligible net unrealized accounts receivable complied with the requirements set forth in the BNPP Credit Facility. The chart below summarizes the representations made in these BNPP Borrowing Base Reports.

| Date of Report | Date of Certificate | Eligible Accounts Receivable | Eligible Inventory | Net Unrealized Forward Gains | Borrowing Availability |
|---|---|---|---|---|---|
| 12/07/15 | 12/10/15 | $74,744,310 | $299,486,576 | $50,185,481 | $6,000,000 |
| 12/14/15 | 12/18/15 | $77,466,244 | $295,995,165 | $48,160,847 | $9,000,000 |
| 12/21/15 | 12/29/15 | $78,723,102 | $297,474,851 | $51,617,994 | $4,000,000 |
| 12/28/15 | 12/31/15 | $ 3,452,606 | $296,887,330 | $49,538,602 | $4,500,000 |
| 12/31/15 | 01/07/16 | $79,922,566 | $275,592,419 | $55,312,681 | $35,500,000 |
| 01/07/16 | 01/12/16 | $75,102,455 | $286,981,226 | $55,694,977 | $17,500,000 |
| 01/14/16 | 01/21/16 | $77,069,819 | $292,113,117 | $53,164,528 | $8,000,000 |
| 01/21/16 | 01/27/16 | $76,081,230 | $291,748,308 | $56,934,583 | $7,000,000 |

| 01/29/16 | 02/04/16 | $76,985,143 | $292,525,675 | $61,318,285 | $8,000,000 |
| 02/05/16 | 02/11/16 | $78,939,346 | $290,512,455 | $59,538,721 | $4,000,000 |
| 02/12/16 | 02/19/16 | $79,561,195 | $292,333,170 | $54,873,070 | $9,500,000 |

174. The BNPP Borrowing Base Reports contained knowingly false material representations about Transmar's borrowing base. The values set forth therein for Transmar's inventory, accounts receivable, and net unrealized forward gains were false in each of the BNPP Borrowing Base Reports as of the dates set forth above.

175. The Fraud Defendants each knew that the representations in the BNPP Borrowing Base Reports were false, and they each intended to deceive and defraud the Continuing Lenders by inducing them to participate in and increase their commitments, and forbear from accelerating the loans under, the Credit Agreement.

176. The Continuing Lenders reasonably and justifiably relied on the BNPP Borrowing Base Reports when they increased their proportional commitments to loan money to Transmar under the Credit Agreement, exceeding the obligations that had existed under the BNPP Credit Facility.

177. As a direct and proximate cause of the Fraud Defendants' fraudulent inducement, the Continuing Lenders suffered damages, including the amounts by which they increased the amounts they loaned between the BNPP Credit Facility and the Credit Agreement, or amounts which the Continuing Lenders failed to recover by accelerating the loan before collateral was depleted.

**All Lenders were fraudulently induced to participate in the Credit Agreement.**

178.   The Lenders were induced to participate in the Credit Agreement by the intentionally false representations about Transmar's borrowing base and financial condition contained in: (i) the Borrowing Base Report as of February 22, 2016; (ii) Transmar's financial statements as of December 31, 2014; and (iii) Transmar's monthly financial statements from 2015.

179.   The Fraud Defendants each knew about and participated in the false representations in the Borrowing Base Report as of February 22, 2016, the December 31, 2014 financial statements, and the monthly financial statements.

180.   The Lenders reasonably and justifiably relied on the false representations when each Lender was induced to participate in the Credit Facility and advance funds to Transmar.

181.   As a direct and proximate cause of the Fraud Defendants' fraudulent inducement, the Lenders suffered damages, including the amounts they advanced to Transmar in connection with the Credit Agreement.

**The conspiracy to commit fraudulent inducement**

182.   Defendants each entered into an agreement with each other for the purposes of: (i) inducing the Lenders to participate in the Credit Agreement and (ii) inducing the Continuing Lenders to increase their participation in the Credit Agreement. That agreement is evidenced by, among other things, the emails described above in which the Defendants discussed their plans, the practice of keeping two sets of books, and the false information sent to the Lenders.

183.    Each Defendant's agreement to enter into the conspiracy and their intentional participation in the conspiracy are established by, among other things, the emails summarized above in connection with Count One.

184.    Pizzi's agreement to enter into the conspiracy and her participation in it are demonstrated, *inter alia*: by: (i) the March 1, 2015 emails about distinguishing between real and fake transactions in the two sets of books; (ii) the March 26, 2015 email concerning the practice of entering into fake transactions with Euromar; (iii) the June 30-July 1, 2015 emails concerning Transmar's two sets of books; (iv) the March 3-7, 2016 email chain concerning tactics to inflate the borrowing base; and (v) the October 25-27, 2016 emails about efforts to avoid detection of the fraud.

185.    Yu's agreement to enter into the conspiracy and his participation in it are demonstrated, *inter alia*, by: (i) the June 30-July 1, 2015 emails concerning Transmar's two sets of books; and (ii) the October 25-27, 2016 emails about efforts to avoid detection of the fraud.

186.    The purpose of Defendants' agreement was unlawful. Defendants knew the only way the Lenders would enter into the Credit Agreement was if the Lenders received representations that there was sufficient collateral to fully collateralize the amounts to be advanced under the Credit Agreement, and that Transmar's financial statements were set forth accurately and in accordance with GAAP. Defendants' agreement was secret because, as described in their internal emails, the disclosure of the fraudulent nature of the Borrowing Base Reports

posed an "existential threat" to the company. The secret nature of Defendant's conspiracy is also established by their efforts to avoid detection by the Lenders.

187.    Overt acts in furtherance of the conspiracy to fraudulently induce the Lenders included: (i) Reich's signature on the Certifications accompanying the Borrowing Base Report as of February 22, 2016, and the monthly financial statements; (ii) the delivery of the financial statements as of December 31, 2014 and the monthly financial statements to the Lenders; (iii) the maintenance of two sets of books by Pizzi, Yu, and O'Connor; and (iv) the failure of Mary Johnson, Timothy Johnson, and Johnson Sr. to stop the fraud even though they had a duty to do so as Transmar's directors.

188.    The overt acts gave the Lenders false assurances that there was enough collateral to support the funding sought by or received by Transmar and that Transmar's overall financial condition was strong enough to justify the decision to participate in the Credit Agreement.

189.    The Lenders suffered damages as a proximate cause of the conspiracy when they agreed to enter into the Credit Agreement and loaned money to Transmar, in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### Conspiracy to commit fraud
### (All Plaintiffs against all Defendants)

190.    The foregoing paragraphs are realleged herein.

**The underlying fraud**

191.   The Fraud Defendants are responsible for the intentional misrepresentations of material fact made to the Lenders about Transmar's financial condition and its borrowing base. The Fraud Defendants knew about and participated in the creation and dissemination of the false reports about Transmar's borrowing base and Transmar's materially misstated monthly and annual financial statements.

192.   The representations about Transmar's financial condition and the borrowing base were false because Transmar's assets and collateral were overstated. Transmar's financial condition and borrowing base were not in compliance with the Credit Agreement, contrary to the Fraud Defendants' representations. Transmar's financial statements materially misstated the amount of the company's inventory, the value of the forward transactions, and the Euromar-Transmar balance, among other deficiencies.

**All Defendants were members of the conspiracy to commit fraud.**

193.   Defendants each entered into an agreement for the purpose of sending the Lenders fraudulent information about Transmar's financial condition and the borrowing base. Another important aspect of Defendants' agreement was working together to ensure that the Lenders did not discover the fraud. Defendants' agreement is evidenced by, among other things, the various emails described above in which Defendants discussed the practices of keeping two sets of books and sending "adjusted" borrowing base information to the company's lenders.

194.   Each Defendant's agreement to enter into the conspiracy and their intentional participation in the conspiracy are established by, among other things, the emails summarized in connection with the First Cause of Action.

195.   Pizzi's agreement to enter into the conspiracy and her participation in it are demonstrated by, *inter alia*: (i) the March 1, 2015 emails about distinguishing between real and fake transactions in the two sets of books; (ii) the March 26, 2015 email concerning the practice of entering into fake transactions with Euromar; (iii) the June 30-July 1, 2015 emails concerning Transmar's two sets of books; (iv) the March 3-7, 2016 email chain concerning tactics to inflate the borrowing base; and (v) the October 25-27, 2016 emails about efforts to avoid detection of the fraud.

196.   Yu's agreement to enter into the conspiracy and his participation in it are demonstrated by, *inter alia*: (i) the June 30-July 1, 2015 emails concerning Transmar's two sets of books; and (ii) the October 25-27, 2016 emails about efforts to avoid detection of the fraud.

197.   The purpose of Defendants' agreement was unlawful. Defendants knew the only way the Lenders would provide financing to Transmar was if the Lenders received Borrowing Base Reports and financial statements that reflected that there was sufficient collateral to comply with the Credit Agreement. Defendants wrongfully concealed the fact that Transmar had suffered operating losses since approximately 2012. Defendants' agreement was secret because the

disclosure of the fraudulent Borrowing Base Reports or other false information posed an "existential threat" to the company.

198.    Overt acts in furtherance of the conspiracy included: (i) Reich's signature on each of the fraudulent Certifications delivered in connection with the Borrowing Base Reports and the monthly financial statements; (ii) Johnson Jr.'s movement of accounts receivable and inventory to and from Euromar; (iii) the creation and distribution of false financial statements; (iv) the maintenance of two sets of books by Pizzi, Yu, and O'Connor; and (v) the failure of Mary Johnson, Timothy Johnson, and Johnson Sr. to stop the fraud even though they had a duty to do so as Transmar's directors.

199.    The overt acts gave the Lenders false assurances about Transmar's overall financial condition and led them to believe that there was enough collateral to support the funding sought by or received by Transmar.

200.    The Lenders suffered damages as a proximate cause of the false representations about Transmar's collateral and its overall financial condition. The Lenders justifiably relied upon the false representations when they entered into the Credit Agreement and advanced funds to Transmar.

201.    The Lenders suffered damages as a proximate cause of the conspiracy when they loaned money to Transmar under the Credit Agreement, in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### Aiding and abetting fraud
### (All Plaintiffs against Timothy Johnson,
### Mary Johnson, Pizzi, O'Connor, and Yu)

202.    The foregoing paragraphs are realleged herein.

203.    Timothy Johnson, Mary Johnson, Pizzi, O'Connor, and Yu (the "**Aiding and Abetting Defendants**") aided and abetting the fraud perpetrated by Johnson Sr., Johnson Jr., and Reich concerning the fraudulent Borrowing Base Reports and the misrepresentation of Transmar's financial condition.

204.    Johnson Sr., Johnson Jr., and Reich committed fraud through the fraudulent misrepresentations about Transmar's borrowing base and overall financial condition. Johnson Sr., Johnson Jr., and Reich also committed fraud by entering into, or instructed others to enter into, transactions for the purpose of manipulating the borrowing base and misrepresenting Transmar's financial condition. Johnson Sr., Johnson Jr., and Reich made decisions about the nature and extent of the false transactions and the manipulation of the borrowing base and Transmar's financial condition. Johnson Sr., Johnson Jr., and Reich are responsible for the false representations for the reasons set forth in connection with the First Cause of Action above.

205.    Johnson Sr., Johnson Jr., and Reich made and directed these misrepresentations intentionally with the purpose that the Lenders rely on them.

206.    Plaintiffs reasonably relied on the false statements and omissions by Johnson Sr., Johnson Jr., and Reich when the Lenders decided to participate in the Credit Agreement and loan money to Transmar.

207.    The Aiding and Abetting Defendants had actual knowledge of the fraud perpetrated by Johnson Sr., Johnson Jr., and Reich. The Aiding and Abetting Defendants exchanged emails with Johnson Sr., Johnson Jr., and Reich and followed their instructions concerning the conduct of the fraud. In addition, O'Connor, Yu, and Pizzi knew about the fraud because their responsibilities included keeping Transmar's two sets of books. The knowledge of each Aiding and Abetting Defendant about the fraud is established by, among other things, the emails summarized in Counts One and Five.

208.    The Aiding and Abetting Defendants substantially assisted the fraud in several ways. Mary Johnson and Timothy Johnson substantially assisted the fraud because they failed to stop it even though, as Transmar's directors, they had a duty to do so. O'Connor substantially assisted the fraud by drafting the Borrowing Base Reports that implemented the fraud directed by Johnson Sr. and Johnson Jr. Pizzi and Yu substantially assisted the fraud by entering fraudulent transactions on Transmar's books and by maintaining the two sets of books. Pizzi and Yu also substantially assisted the fraud by enabling Johnson Sr. and Johnson Jr. to keep track of the amount by which the Borrowing Base was overstated and in what ways it was overstated. Pizzi, Yu, and O'Connor also entered transactions in

Transmar's books and directed others to enter transactions to avoid detection of the fraud by the Lenders or their collateral agent.

209.    As a proximate cause of the Aiding and Abetting Defendants' substantial assistance to the fraud, the Lenders suffered damages in amount to be determined at trial.

## RELIEF REQUESTED

Wherefore, Plaintiffs respectfully request that the Court enter judgment and grant it the following relief against the Defendants:

1.    Actual, compensatory, and all other damages, including interest owed under the Credit Agreement, in an amount to be determined at trial;

2.    Punitive damages;

3.    Pre-judgment interest at the rate at the highest possible rate allowed by law, by reference to either the Credit Agreement, statute, or otherwise;

4.    Attorneys' fees and costs incurred in the prosecution of this action as allowed by law; and

5.    All other relief to which Plaintiffs are entitled at law or in equity.

Dated:  New York, New York
         January 8, 2018

                            REID COLLINS & TSAI LLP

                            /s/   *Jeffrey E. Gross*
                            Rachel S. Fleishman (pro hac vice
                            application to be filed)
                            Jeffrey E. Gross (016171998)
                            Yonah Jaffe (026542012)
                            810 Seventh Avenue, Suite 410
                            New York, New York 10019
                            Tel.: (212) 344-5200

                            *Counsel to Plaintiffs*